IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DELTA PEGASUS MANAGEMENT, L.L.C., and MICHAEL L. LABERTEW, attorney in fact for, and on behalf of, P.B., as Co-Trustee of the B. 1988 TRUST, and as Co-Trustee of the P.B. REVOCABLE LIVING TRUST, <br><br> Plaintiffs, <br><br> v. <br><br> NETJETS SALES, INC.; NETJETS SERVICES, INC.; and NETJETS AVIATION, INC., <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' RENEWED MOTION TO TRANSFER VENUE** <br><br> Case No. 2:21-cv-00393-RJS-DAO <br><br> Chief Judge Robert J. Shelby <br><br> Magistrate Judge Daphne A. Oberg |

In this case, the court is tasked with analyzing the enforceability of a forum selection clause when only some of the litigating parties signed the contract containing the clause. Plaintiff Delta Pegasus, LLC, entered into a lease agreement with Defendants NetJets Sales, Inc., NetJets Services, Inc., and NetJets Aviation, Inc. (collectively, NetJets), in which Delta Pegasus agreed to make monthly payments in exchange for a fractional interest in an aircraft. This contract contained a clause selecting the Southern District of Ohio as the chosen forum for any lawsuit brought in federal court over the agreement or the subject matter therein. After Delta Pegasus defaulted on several of its payments, Plaintiffs P.B., the B. 1988 Trust, and the P.B. Revocable Living Trust paid NetJets approximately $988,000. Plaintiffs then brought suit in this court, alleging they were improperly induced by NetJets into making the payments.

Before the court are two motions: (1) NetJets' Renewed Motion to Transfer Venue[1] and (2) NetJets' Motion to Dismiss the Amended Complaint.[2] In its Motion to Transfer, NetJets

---

[1] Dkt. 42.

[2] Dkt. 41.

seeks to enforce the forum selection clause not only against Delta Pegasus, but against the three non-signatory plaintiffs as well.  Although the court declines NetJets' invitation to enforce the forum selection clause against non-signatories, for the reasons explained below, the court GRANTS NetJets' Renewed Motion to Transfer Venue.  Accordingly, the case is hereby TRANSFERRED to the United States District Court for the Southern District of Ohio.  As a result of this decision, resolution of NetJets' Motion to Dismiss is left for the transferee court.

## BACKGROUND

The following facts are drawn from the Verified Amended Complaint (VAC),[3] and the four agreements Plaintiffs appended to it.  When facing a challenge that the venue where the plaintiff filed suit is improper, the plaintiff is entitled to rely on the well-pled facts in the operative complaint, so long as they are not controverted by a defendant's affidavit.[4]  Here, no affidavit has been submitted by NetJets, and both sides rely only on the VAC and the exhibits attached thereto.

Plaintiff P.B. is a Utah citizen who suffers from "severe memory loss, poor executive functioning skills, [and] advanced dementia."[5]  For these reasons, Attorney Michael L. Labertew "has been appointed to act under and pursuant to a general power of attorney for and on behalf of [P.B.], and is empowered to bring this action on [her] behalf."[6]  Plaintiffs the B. 1988 Trust and the P.B. Revocable Living Trust (collectively, the Trusts) were both established "to protect and preserve [P.B.'s] assets, income and property," and both Trusts' settlors and beneficiaries are all

---

[3] Dkt. 37.

[4] *See Pierce v. Shorty Smalls of Branson, Inc.*, 137 F.3d 1190, 1192 (10th 1998) (discussing this standard in the context of a motion to dismiss for improper venue); *see also Hill v. Farmers Ins. Grp. of Cos.*, No. CIV 08-1174 BB/LFG, 2010 U.S. Dist. LEXIS 30332, at *1 (D.N.M. Mar. 24, 2010) (noting that, on a motion requesting dismissal for improper venue or in the alternative transfer to the correct venue, "the court must accept as true the plaintiff's well-pled allegations and draw all reasonable inferences therefrom although the court need not accept plaintiff's legal conclusions as true").

[5] Dkt. 37 ¶¶ 3–4.

[6] *Id.* ¶ 4.

Utah citizens.[7] Attorney Labertew is "a Co-Trustee and Successor Co-Trustee" of the Trusts, and "has authority to bring this action on [their] behalf."[8] Plaintiff Delta Pegasus Management, L.L.C., is a Missouri limited liability company whose members and managers are citizens of Utah.[9] During the timeframe relevant to this case, P.B. was Delta Pegasus's manager.[10]

NetJets sells and leases fractional interests in private jets, through which buyers purchase a share in an aircraft, guaranteeing them annual flying time proportional to the share they buy.[11] In 2011, NetJets and Delta Pegasus signed three agreements (collectively, the 2011 Agreements) in a contemporaneous transaction.[12] First, in the Purchase & Owners Agreement, NetJets marketed, solicited, and sold to Delta Pegasus a 9.375% fractional ownership interest in a jet aircraft.[13] Second, under the Aircraft Lease and Exchange Agreement, Delta Pegasus agreed to lease its fractional interest in the aircraft to NetJets.[14] Third, the Management Services Agreement obligated Delta Pegasus to make monthly payments to NetJets for management fees and lease payments.[15] P.B. signed all three agreements on behalf of Delta Pegasus as its "Manager."[16]

From September 2011 through July 2016, Delta Pegasus made regular payments to NetJets, consistent with the 2011 Agreements.[17] Plaintiffs allege that, during this time, Delta Pegasus's "use of the jet aircraft was sporadic and minimal."[18]

---

[7] *Id.* ¶¶ 5–6.

[8] *Id.*

[9] *Id.* ¶ 1.

[10] Dkt. 41 ¶ 3; Dkt. 46 (Plaintiffs' Opposition to Defendants' Motion to Dismiss) ¶¶ 2–3.

[11] Dkt. 41 ¶ 2; *see* Dkt. 37 ¶¶ 7–9, 17–19.

[12] Dkt. 37 ¶¶ 17–19.

[13] Dkt. 37 ¶ 17; *see* Dkt. 37-1 (Ex. A to Amended Complaint: 2011 Purchase Agreement).

[14] Dkt. 37 ¶ 18; *see* Dkt. 37-2 (Ex. B to Amended Complaint: 2011 Lease Agreement).

[15] Dkt. 37 ¶ 19; *see* Dkt. 37-3 (Ex. C to Amended Complaint: 2011 Management Services Agreement).

[16] Dkt. 37-1 at 1; Dkt. 37-2 at 3; Dkt. 37-3 at 1.

[17] Dkt. 37 ¶ 20.

[18] *Id.* ¶ 20.

On July 5, 2016, NetJets allegedly "undertook and did induce" P.B. to sign a new Fractional Lease Agreement (the 2016 Agreement) on behalf of Delta Pegasus, "[d]espite knowing of Delta Pegasus'[s] sporadic and minimal use of the jet aircraft . . . covered by [the 2011 Agreements]."[19] Specifically, "[w]hile making the inducements related to the [2016] Agreement, [NetJets] (through [its] representatives, agents, and employees) obtained knowledge and information that '[P.B.] may be under some type of disability and care' related to her ability to make sound financial decisions and that she suffered from poor memory, lack of problem-solving skills, and poor functioning abilities."[20] Under the 2016 Agreement, Delta Pegasus "agreed to lease a 9.375% interest in another aircraft and to again participate" in a fractional leasing program.[21] Of note, the 2016 Agreement contains the following forum selection clause (Forum Selection Clause):

> **Governing Law and Court Jurisdiction.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of Ohio, without regard to that state's or any other state's choice of law provisions. Any action or other legal proceeding of any kind, legal or equitable, based upon or in any way related to the subject matter of this Agreement, including the sale, lease, operation, maintenance, management, inspection, servicing or occupancy of the Aircraft, shall be brought exclusively in an appropriate court of competent jurisdiction located in Franklin County, Ohio (if the action is brought in state court) or in the United States District Court for the Southern District of Ohio (if the action is brought in federal court). The Parties further agree that a final judgment in any such action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.[22]

From July 5, 2016, through July 31, 2018, Delta Pegasus made regular payments to NetJets, "consistent with the terms and conditions" of the 2016 Agreement.[23] But during this

---

[19] *Id.* ¶ 21.

[20] *Id.* ¶ 24.

[21] Dkt. 41 ¶ 3; *see* Dkt. 37 ¶ 21.

[22] Dkt. 37-4 (Ex. D. to Amended Complaint: 2016 Fractional Lease Agreement) ¶ 4.2 [hereinafter 2016 Agreement].

[23] Dkt. 37 ¶ 25.

time, "Delta Pegasus'[s] use of the jet aircraft was extremely limited, sporadic and minimal."[24]
After July 31, 2018, the required payments of $22,000 per month went unpaid.[25] According to
Plaintiffs, at some point after Delta Pegasus began defaulting, "representatives and employees"
of NetJets "coerced" P.B. and the two Trusts into paying NetJets "hundreds of thousands of
dollars."[26] All told, P.B. and the Trusts "paid in excess of $988,000" from January 2018
onward—while allegedly not using the aircraft.[27] And because these payments were made by
P.B. and the Trusts, instead of Delta Pegasus, NetJets "knew, or had reason to know" that the
money was "not [coming] from its contractual partner."[28]

Plaintiffs claim certain NetJets "representatives"—without detailing who or when—have
"acknowledged and admitted that their telephonic communications with [P.B.] revealed to these
representatives that [P.B.] 'may be under some type of disability and/or care.'"[29] NetJets agents
have "repeatedly contacted and communicated with [P.B.] by telephone and other means to
obtain money and thereby learned, or should have learned, of her deteriorating condition."[30]

Plaintiffs initiated this action on June 4, 2021,[31] invoking federal diversity jurisdiction
pursuant to 28 U.S.C. § 1332(a) and (c).[32] In their Original Complaint, Plaintiffs asserted five
claims: breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary
duty, unjust enrichment, and recission.[33] On August 5, 2021, NetJets filed a Motion to Change

---

[24] *Id.* ¶ 25.

[25] *Id.* ¶ 26.

[26] *Id.* ¶ 28.

[27] *Id.* ¶ 36.

[28] *Id.* ¶ 30.

[29] *Id.* ¶ 33.

[30] *Id.* ¶ 32.

[31] *See* Dkt. 2 (Original Complaint).

[32] *Id.* ¶ 9.

[33] *Id.* ¶¶ 36–65.

5

Venue to the Southern District of Ohio based on the Forum Selection Clause.[34]  The next day, NetJets also moved to dismiss the Original Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[35]  After both motions were fully briefed, Plaintiffs filed a Motion to Amend their Complaint "[i]n order to remedy the[] objections" NetJets had presented in its motions.[36]

NetJets opposed the Motion to Amend, asserting its Motion to Change Venue should be granted first, leaving the Motion to Amend for the transferee court to address.[37]  The Motion to Amend was referred to Magistrate Judge Daphne A. Oberg under 28 U.S.C. § 636(b)(1)(A).[38] Judge Oberg disagreed with NetJets, finding that "[w]here the parties dispute whether the proposed amended complaint would be subject to the forum selection clause," it is an issue "more appropriately addressed after leave to amend has been granted and the operative pleading is in place."[39]  Judge Oberg then applied the factors under Federal Rule of Civil Procedure 15(a) and concluded that Plaintiffs should be granted leave to amend the Original Complaint.[40]

Plaintiffs filed the VAC on December 29, 2021, bringing two causes of action: exploitation of a vulnerable adult under Utah Code § 62A-3-314(1) and restitution of unjust enrichment.[41]  By statute, Utah has created a private right of action for the elderly and other vulnerable adults to address harm they have suffered as a result of financial exploitation.[42]  And under Utah common law, unjust enrichment is an equitable remedy providing relief when a

---

[34] Dkt. 16 (Defendants' First Motion to Change Venue).

[35] Dkt. 17 (Defendants' First Motion to Dismiss).

[36] Dkt. 30 at 2.

[37] Dkt. 31 at 2–6.

[38] Dkt. 27.

[39] Dkt. 36 at 5.

[40] Dkt. 36 at 7.

[41] Dkt. 37 at 9–11.

[42] Utah Code § 62A-3-314(1) ("A vulnerable adult who suffers harm or financial loss as a result of exploitation has a private right of action against the perpetrator."); *see also id.* § 62A-3-301(30) (defining "vulnerable adult").

defendant has unfairly received something of value from the plaintiff and there is no express contract between the parties.[43]

On January 24, 2022, Defendants filed a Renewed Motion to Change Venue[44] and a Motion to Dismiss the Amended Complaint pursuant to Rule 12(b)(6).[45]  After receiving the parties' briefing,[46] the court heard argument on the Renewed Motion to Change Venue on June 2, 2022.[47]

## ANALYSIS

In its Renewed Motion to Change Venue, NetJets argues the Forum Selection Clause in the 2016 Agreement is mandatory, encompasses the claims asserted in the VAC, is enforceable against all parties, and requires transfer to the U.S. District Court for the Southern District of Ohio under 28 U.S.C. § 1404(a).[48]  Plaintiffs disagree, arguing the Clause is invalid for fraud or overreaching, it is unenforceable because three Plaintiffs did not sign the 2016 Agreement, and the standard §1404(a) factors weigh in favor of keeping the case in the District of Utah.[49]

Below, the court first discusses general principles concerning venue transfer, how the analysis is affected by a forum selection clause, and choice of law issues.  The court then

---

[43] *See TruGreen Cos., L.L.C. v. Mower Brothers*, 2008 UT 81, ¶ 18, 199 P.3d 929 ("[R]estitution and unjust enrichment are remedies found in quantum meruit. As tools of equity, they are used only when no express contract is present." (internal citations omitted)).

[44] Dkt. 42.

[45] Dkt. 41.

[46] Dkt. 46; Dkt. 47 (Plaintiffs' Opposition to Defendants' Renewed Motion to Transfer Venue); Dkt. 50 (Defendants' Reply in Support of Renewed Motion to Transfer Venue); Dkt. 51 (Defendants' Reply in Support of Motion to Dismiss Amended Complaint).

[47] The court initially noticed a hearing on both of NetJets' Motions, *see* Dkt. 52 (Notice of Hearing on Defendants' Motion to Dismiss Amended Complaint and Defendants' Motion to Change Venue), but there was insufficient time to hear argument from the parties on the Motion to Dismiss, *see* Dkt. 53 (Minute Entry for June 2, 2022 Hearing). In any event, based on the court's conclusion that the entire case must be transferred, any argument on the Motion to Dismiss will presumably be heard by the transferee court, as appropriate.

[48] Dkt. 42 at 1.

[49] *See generally* Dkt. 47.

addresses Plaintiffs' fraud arguments and analyzes the Forum Selection Clause's enforceability against the parties who did not sign it. Finally, the court conducts a modified § 1404(a) analysis concluding that the entire case should be transferred to the Southern District of Ohio based on convenience, fairness, and justice interests. Based on that conclusion, NetJets' Motion to Dismiss will not be considered by this court and is reserved for resolution by the transferee court.

## I.    *Legal Standards and Choice of Law Issues*

Venue "refers to the geographic specification of the proper court . . . for the litigation of a civil action that is within the subject-matter jurisdiction of the [federal] district courts in general."[50] When a party asserts "venue is 'wrong' or 'improper,'" it is an issue "generally governed by 28 U.S.C. § 1391" and the party may move for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(3) or 28 U.S.C. § 1406(a).[51]

However, the existence of a valid forum selection clause in a contract between litigants changes the analysis. "Although a forum-selection clause does not render venue in a court 'wrong' or 'improper' within the meaning of § 1406(a) or Rule 12(b)(3), the clause may be enforced through a motion to transfer under § 1404(a)."[52] That statute provides that "a district court may transfer any civil action . . . to any district or division to which all parties have consented."[53] Thus, § 1404(a) "permits transfer to any district where venue is also proper . . . or to any other district to which the parties have agreed by contract or stipulation," such as through a forum selection clause.[54]

---

[50] 28 U.S.C. § 1390(a).

[51] *Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 55 (2013); *see* Fed. R. Civ. P. 12(b)(3) (providing for parties to seek dismissal for "improper venue"); 28 U.S.C. § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.").

[52] *Atl. Marine*, 571 U.S. at 59.

[53] 28 U.S.C. § 1404(a).

[54] *Atl. Marine*, 571 U.S. at 59.

When evaluating a forum section clause, the court must, "[a]s a threshold matter, . . . resolve which law applies."[55] This is especially important where, as here, the parties have interwoven citations to both state and federal substantive law in their briefs, without discussing which law actually applies.[56] Forum selection clauses routinely present federal courts with a choice of law conundrum: whereas contracts are typically interpreted according to state law, venue is governed by federal statutes.[57] Although the Supreme Court has not directly addressed the choice of law distinction between interpretation and enforceability,[58] some circuit courts of appeal have recognized a "distinction . . . between what law governs the enforceability of a forum selection clause and what law governs the interpretation of a forum selection clause."[59] Most courts to face this issue have applied federal law to issues of enforceability, while interpreting the clause's text itself according to state law (typically the state identified in a related choice of law clause).[60] This approach makes sense because "interpretation of a forum

---

[55] *See Northwest Bldg. Components, Inc. v. Adams*, No. 22-cv-00790-CMA-KLM, 2022 U.S. Dist. LEXIS 94910, at *8 (D. Colo. May 26, 2022).

[56] *See, e.g.*, Dkt. 42 at 8–10 (citing, at various points, federal cases applying Utah law, state cases applying Ohio law, and federal cases applying federal common law); Dkt. 47 at (citing Utah appellate case law and federal cases applying law of other states).

[57] *See generally Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988) (addressing "whether a federal court sitting in diversity should apply state or federal law in adjudicating a motion to transfer a case to a venue provided in a contractual forum-selection clause," weighing the competing authorities, and concluding federal law governs the issue). *See also, e.g.*, *Unitednet, Ltd. v. Tata Communs. Am., Inc.*, No. 1:21-cv-01081-KWR-JFR, 2022 U.S. Dist. LEXIS 90697, at *11 (D.N.M. Mar. 19, 2022) (collecting cases and noting it "remains unsettled . . . which law—federal law, the forum state's law, or the parties' contracted-for-law—governs the enforceability and interpretation of a forum selection clause in diversity cases"); *Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, No. 1:20-cv-02757-DDD-STV, 2020 U.S. Dist. LEXIS 191690, at *11 n.1 (D. Colo. Oct. 16, 2020) (observing lack of clarity and disagreement among federal courts on this issue).

[58] *See N.M. ex rel. Balderas v. Real Estate Law Ctr., P.C.*, 430 F. Supp. 3d 900, 929 (D.N.M. 2019).

[59] *Id.* at 919 (citing, e.g., *Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 430 (10th Cir. 2006); *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 770 (5th Cir. 2016); *Martinez v. Bloomberg LP*, 740 F.3d 211, 220 (2d Cir. 2014)). The Tenth Circuit appears not to have addressed this choice-of-law issue. *See Presidential Hosp., LLC v. Wyndham Hotel Grp., LLC*, 333 F. Supp. 3d 1179, 1210 (D.N.M. 2018) (noting that "the Tenth Circuit has not drawn rigid distinctions between state and federal law when interpreting forum selection clauses").

[60] *See Balderas*, 430 F. Supp. at 929–934 (surveying case law from various circuits and Tenth Circuit district courts to reach this conclusion); *accord Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, No. 1:20-cv-02757-DDD-STV, 2020 U.S. Dist. LEXIS 191690, at *11 n.1 (D. Colo. Oct. 16, 2020) (noting that "[t]he *Balderas court*

selection clause is a pure question of contract law, which lies in the realm of state law,"[61] whereas enforcement—i.e., whether to transfer the case to another venue pursuant to the clause— implicates federal statutes, namely 28 U.S.C §§ 1391, 1404, and 1406.[62] And "a [federal] district court sitting in diversity must apply a federal statute that controls the issue before the court" so long as the statute "represents a valid exercise of Congress' constitutional powers."[63]

The parties do not present competing views on how to interpret the Forum Selection Clause's terms, but rather present several other reasons why the Clause should or should not be enforced.[64] Since this court is tasked with determining whether the Forum Selection Clause is enforceable against Plaintiffs, as opposed to interpreting the text of the Clause itself, "'federal law, specifically 28 U.S.C. § 1404(a)' and federal common law interpreting that statute, 'governs . . . whether to give effect to the parties' forum-selection clause and transfer the case.'"[65] Thus, unless otherwise noted, this court will generally apply federal common law in its analysis.

---

surveyed the federal circuits, finding that many of them applied federal law to issues of 'enforceability' while some applied state law to issues of 'interpretation'–particularly where the relevant contract had a choice-of-law clause pointing to state law").

[61] *Balderas*, 430 F. Supp. 3d at 933 (citing, e.g., *Stewart*, 487 U.S. at 36 (Scalia, J., dissenting)); *accord Kelvion, Inc. v. Petrochina Can., Ltd.*, 918 F.3d 1088, 1092 (10th Cir. 2019) ("The scope of a forum-selection clause is evaluated according to ordinary principles of contractual interpretation.").

[62] *See Atl. Marine*, 571 U.S. at 56 ("[T]he venue statutes reflect Congress' intent that venue should always lie in *some* federal court whenever federal courts have personal jurisdiction over the defendant.").

[63] *Stewart*, 487 U.S. at 27.

[64] *See generally* Dkt. 42; Dkt. 47; Dkt. 50. NetJets does devote a portion of its Motion to explaining why the Forum Selection Clause is mandatory given its use of the terms "shall" and "exclusively" regarding where "[a]ny action . . . based upon or in any way related to the subject matter of [the 2016] Agreement" are to be brought. *See* Dkt. 42 at 5–6. The court observes that any inquiry over the effect of these terms would likely be conducted according to Ohio law given the choice of law language in the Clause, but since Plaintiffs do not respond to this particular argument by NetJets, *see generally* Dkt. 47, the court will assume, without deciding, that these terms render the Forum Selection Clause mandatory. Thus, there is no dispute over interpretation of the Clause's terms for the court resolve, leaving only questions regarding its enforceability.

[65] *In re Howmedica Osteonics Corp.*, 867 F.3d 390, 407 n.11 (3d Cir. 2017) (quoting *Stewart*, 487 U.S. at 32 (1988)); *cf. K & V Scientific Co. v. Bayerische Motoren Werke Aktiengesellschaft ('BMW')*, 314 F.3d 494, 497 n.4 (10th Cir. 2002) (because neither party disputed the district court's conclusion "that the interpretation of the forum selection clause at issue was a matter of federal common law," treating the "choice of law rules employed by the district court as the law of the case"). *But see Fitness Together*, 2020 U.S. Dist. LEXIS 191690, at *11 n.1 ("It remains unclear what law would govern whether a non-signatory is bound to a forum-selection clause in a diversity action or for supplemental state-law claims like those at issue here.").

There appear to be no Tenth Circuit Court of Appeals cases directly addressing the issue of whether non-signatories to a contract may be bound by a forum selection clause contained in that contract.[66] Thus, because the case presents issues governed by federal common law, and there are no Tenth Circuit pronouncements directly on-point, the court looks to case law from other circuits, as well as other district courts in this Circuit.[67]

According to the Supreme Court, forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances," or "that the clause is invalid for such reasons as fraud or overreaching."[68] In the Tenth Circuit, the party seeking to avoid application of a forum selection clause for fraud must make a heightened showing that the clause itself, as opposed to the contract as a whole, was the subject of fraud or overreaching.[69]

The presumption of validity is based on the rationale that parties "validly consent to be sued in [the] jurisdiction" by virtue of being "parties to the contract" containing the forum selection clause.[70] But if a forum selection clause is invoked against parties who did not sign the

---

[66] See, e.g., Presidential Hosp., 333 F. Supp. 3d at 1225 (observing that "[t]he Tenth Circuit has never considered whether a forum selection clause can bind a non-party").

[67] See Presidential Hosp., 333 F. Supp. 3d at 1225 (after observing that the Tenth Circuit has not addressed whether a forum selection clause can bind a non-signatory, surveying the "prevailing winds from [other] United States Courts of Appeals," and choosing among those decisions to determine the action most consistent with Tenth Circuit law); cf. Miller v. Monumental Life Ins. Co., 502 F.3d 1245, 1249–50 (10th Cir. 2007) (noting that its decision "to apply federal common law" to interpret the text of a benefit plan was "consistent" with Tenth Circuit precedent on similar issues, as well as treatment by "the vast majority of other circuits").

[68] M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10, 15 (1972), overruled by statute in part as stated in Stewart, 487 U.S. at 28–29 (noting "the Bremen case may prove instructive in resolving the parties' dispute" over a forum selection clause's applicability, but the "first question for consideration [is] whether § 1404(a) itself controls" (quotation simplified)).

[69] Niemi v. Lasshofer, 770 F.3d 1331, 1351–52 (10th Cir. 2014).

[70] See Bremen, 407 U.S. at 10–11 (quotation simplified); see also Atl. Marine, 571 U.S. at 62 ("When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." (emphasis added)).

contract, application of this presumption is less clear.[71]  This is because a valid forum selection clause is generally only "applicable if its scope encompasses the dispute, which [courts] assess using normal principles of contract interpretation."[72]  And it is a fundamental principle of contract that, to enforce a contractual provision against a party, that party must have assented to the underlying agreement containing the provision.[73]

Additionally, even if a district court finds the forum selection clause inapplicable to the parties or the claims asserted under ordinary principles of contract, the court nevertheless retains discretion under § 1404(a) to transfer the case to another federal district if it determines that doing so will best serve the "convenience of parties and witnesses" and "the interest of justice."[74]  Ultimately, "[s]ection 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness."[75]  In the Tenth Circuit, there is a non-exclusive list of factors to consider when making this case-by-case determination.[76]

Finally, the "party moving to transfer a case pursuant to § 1404(a) bears the burden of establishing that the existing forum is inconvenient"—whether by prior contractual consent to another forum or for another reason.[77]  When considering a motion to transfer venue under

---

[71] *Cf. Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) (noting, in the analogous context of arbitration clauses, that "the presumption in favor of arbitration does not apply . . . when the dispute is whether there is a valid and enforceable arbitration agreement in the first place" (quotation simplified)).

[72] *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 875 (D.C. Cir. 2019).

[73] *Jacks*, 856 F.3d at 1304 ("As every first-year law student knows, an agreement or mutual assent is of course essential to a valid contract." (quotation simplified)).

[74] *See* 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.").

[75] *Stewart*, 487 U.S. at 29 (quotation simplified); *see also Atl. Marine*, 571 U.S. at 60 ("Section 1404(a) is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system.").

[76] *See Chrysler Credit*, 928 F.2d at 1516.  These factors are listed and applied in Section IV, *infra*.

[77] *Id.* at 1515.

12

§ 1404(a), the court accepts as true all well-pleaded allegations in the complaint, unless

contradicted by appropriate evidence put on by the party moving to transfer.[78]

## II. There are Insufficient Facts in the VAC to Support Finding the Forum Selection Clause Itself is Invalid Due to Fraud or Overreaching

Plaintiffs first assert the Forum Selection Clause is "invalid" because—as alleged in the

VAC—the 2016 Agreement was entered into through fraud or overreaching when NetJets

"exploited and took unfair advantage of P.B." as a "vulnerable adult."[79]  But because Plaintiffs

have alleged only that the 2016 Agreement in general was entered into under such circumstances,

not the Forum Selection Clause specifically, this argument fails.

As Plaintiffs point out, forum selection clauses are generally deemed invalid when

entered into as a result of "fraud or overreaching."[80]  However, Defendants correctly counter that

"'fraud [will] be grounds to avoid enforcement of a forum selection clause' only where 'the

fraud complained of [is] specifically related to the inclusion of the forum selection clause.'"[81]

Indeed, in the Tenth Circuit "a plaintiff seeking to avoid a [forum selection clause] on a fraud

theory must plead fraud going to the specific provision," even where it is established that the

contract as a whole was "procured through fraud."[82]

---

[78] *See Carr v. Wells*, No. 20-cv-03319-PAB-SKC, 2022 U.S. Dist. LEXIS 57256, at *22 n.5 (D. Colo. Mar. 28, 2022); *see also Hill*, 2010 U.S. Dist. LEXIS 30332, at *1.

[79] Dkt. 47 at 11–13.

[80] Dkt. 47 at 11–12 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S 1, 15 (1972*)*; *Zions First Nat. Bank v. Allen*, 688 F. Supp. 1495, 1498 (D. Utah 1988)).

[81] Dkt. 50 at 9 (quoting *Zions*, 688 F. Supp. at 1498).

[82] *Niemi v. Lasshofer*, 770 F.3d 1331, 1351–52 (10th Cir. 2014) (quotation simplified).  As discussed in the preceding section, the court generally applies federal common law to determine the enforceability of a forum selection clause. But it is unclear whether it is the federal common law of the present venue where the motion to transfer is pending, or the common law of the contracted-for venue (here, the Southern District of Ohio).  *Cf. Balderas*, 430 F. Supp. 3d at 934–40 (applying the law of every jurisdiction potentially applicable to a forum selection clause to determine its enforceability).  The parties seem to agree that Tenth Circuit law applies to the fraud issue.  Dkt. 47 at 12–13; Dkt. 50 at 7–8.  And further, the court need not resolve the uncertainty here because the Sixth Circuit uses substantively the same standard.  *See Wilson v. 5 Choices, LLC*, 776 Fed. App'x 320, 327 (6th Cir. 2019) ("[T]o hold that a forum-selection clause is not enforceable due to fraud, there must be allegations of fraud that are specific to the inclusion of the forum-selection clause.").  Thus, the result would be the same under either Sixth Circuit or Tenth Circuit law.

13

In the VAC, Plaintiffs allege in several places that P.B., acting on behalf of Delta Pegasus, was wrongfully induced or "coerced" into signing the 2016 Agreement.[83] But there are no allegations that she was induced through fraud or overreaching into agreeing to the Forum Selection Clause specifically. Thus, Plaintiffs cannot avoid enforcement of the Forum Selection Clause based on their allegations of fraud or overreaching.

### III. The Forum Selection Clause is Mandatory and Enforceable Against Only Delta Pegasus and its Claims

Having concluded that the Forum Selection Clause is valid, the court must next determine whether the clause is enforceable as a matter of contract against all Plaintiffs, none of the Plaintiffs, or only certain Plaintiffs. Because the court concludes the Forum Selection Clause is enforceable only as to Delta Pegasus, the Clause requires transferring at least Delta Pegasus and its claims to the Southern District of Ohio.

### A. Enforceability of the Forum Selection Clause with Respect to the Signatory and Non-Signatory Plaintiffs must be Addressed Separately

NetJets presents several arguments why the Forum Selection Clause is enforceable against all four Plaintiffs,[84] even though the 2016 Agreement was signed only by Delta Pegasus, through P.B. as its representative. At the outset, NetJets argues that the Clause's "express terms" alone are broad enough to mandate enforcement as to both signatories and non-signatories.[85] However, as explained below, basic principles of contract law do not allow carte blanche enforcement of the Forum Selection Clause against non-signatories, regardless of the Clause's text. Therefore, application of the Clause must be analyzed separately with respect to Delta Pegasus and the other Plaintiffs.

---

[83] *See* Dkt. 37 ¶¶ 21, 24, 28, 31–42.

[84] For clarity, the four Plaintiffs in this case are Delta Pegasus, P.B. in her personal capacity, and the two Trusts. Dkt. 37 ¶¶ 1, 3, 5, 6.

[85] Dkt. 42 at 5–6.

Whether a forum selection clause is applicable because "its scope encompasses the dispute" is a threshold issue that courts "assess using normal principles of contract."[86]  NetJets contends "[i]t is irrelevant that the Trusts and P.B. in her individual capacity . . . may not have been formal signatories to the [2016] Agreement."[87]  This assertion flies in the face of a fundamental principle of contract law: that the terms of a contract are generally enforceable only against those who have agreed to it, typically through a signature.[88]  There are some notable exceptions to this general rule that can cause non-signatories to be bound, but as explained in Section III.C, it is NetJets' burden to establish one of these exceptions applies.

Thus, despite NetJets' contention otherwise, it is highly relevant that three of the parties NetJets is attempting to enforce the Forum Selection Clause against did not agree to be bound by it in the first place.  As a result, the court will segment its analysis: first addressing the Clause's enforceability against Delta Pegasus, then analyzing its enforceability with respect to P.B. personally, the B. 1988 Trust, and the P.B. Revocable Living Trust (collectively, the Non-Signatory Plaintiffs).

B.  The Forum Selection Clause is Mandatory and Enforceable Against Delta Pegasus

Plaintiffs resist application of the Forum Selection Clause to Delta Pegasus, arguing the claims in the VAC are derived from Utah's elder abuse statute and equitable remedies, not as contractual causes of action, and therefore they "are not based on the [2016 Agreement] and do

---

[86] *See Azima*, 926 F.3d at 875.

[87] Dkt. 42 at 7.

[88] *See Jacks*, 856 F.3d at 1304–05 (noting the "basic principle of contract law" that "an agreement or mutual assent is . . . essential to a valid contract" (quotation simplified)).  In the event Ohio law applies, the court observes this is also the general rule in Ohio.  *See Bank of N.Y. Mellon v. Rhiel*, 122 N.E.3d 1219, 1225 (Ohio 2018) ("Generally speaking, a contracting party's signature manifests the party's intent to be bound by a contract's terms."); *see also Henderson v. Lawyers Title Ins. Corp.*, 843 N.E.2d 152, 161 (Ohio 2006) (clarifying a limited exception exists where "a non-signatory can be bound to provisions of an agreement when the non-signatory seeks a declaratory judgment as to its rights and obligations under the agreement itself").

not arise out of that agreement."[89]  But, as NetJets points out, "[i]f forum selection clauses are to be enforced as a matter of public policy, that . . . policy requires that they not be defeated by artful pleading of claims."[90]  The court agrees with NetJets as to Delta Pegasus.

In *Kelvion, Inc. v. Petrochina Canada, Ltd.*, the Tenth Circuit combined three standards from other circuits to adopt a new test to determine what circumstances obligate a court to enforce a forum selection clause when the parties have a contractual relationship, but one party brings a non-contractual cause of action against the other.[91]  In such situations, "a forum-selection clause will apply to claims that ultimately depend on the existence of a contractual relationship between the parties; where resolution of the claims relates to interpretation of the contract; or when the claims involve the same operative facts as a parallel claim for breach of contract."[92]

Although Plaintiffs are correct that the causes of action asserted in the VAC are not substantively contractual claims, there would be no injury to Delta Pegasus but for the existence of the 2016 Agreement.  Moreover, the Clause itself provides that "[a]ny action or other legal proceeding of any kind, *legal or equitable*, based upon *or in any way related to* the subject matter of [the 2016] Agreement . . . shall be brought exclusively in . . . the United States District Court for the Southern District of Ohio (if the action is brought in federal court)."[93]  Thus, even though the restitution claim arises in equity, and the exploitation claim is a statutory cause of action, both qualify as being "based upon or in any way related to the subject matter of [the 2016] Agreement."  Indeed, just as the plaintiff in *Kelvion* did, Delta Pegasus "originally brought

---

[89] Dkt. 47 at 13.

[90] Dkt. 42 at 9 (quoting *Kelvion*, 918 F.3d at 1094).

[91] *See Kelvion*, 918 F.3d at 1092.

[92] *Id.* (internal citations and quotations omitted).

[93] 2016 Agreement ¶ 4.2 (emphasis added).

a claim for breach of contract" before amending the Complaint,[94] and the fact "that its equitable claims effectively amount to the same" subject matter as its prior contractual claim "is strong evidence of artful pleading to avoid enforcement of the forum-selection clause."[95]

At bottom, the claims as advanced by Delta Pegasus "gr[e]w out of the contractual relationship" between Delta Pegasus and NetJets and "the gist of those claims is a breach of that relationship."[96]  Therefore, the Forum Selection Clause is enforceable against Delta Pegasus as a signatory to the 2016 Agreement, and mandates that Delta Pegasus litigate its claims against NetJets in the Southern District of Ohio.

C. <u>NetJets has Failed to Establish a Coherent and Controlling Legal Principle to Compel Enforcement of the Forum Selection Clause Against the Non-Signatory Plaintiffs</u>

NetJets presents several arguments as to why the Non-Signatory Plaintiffs are also subject to the Forum Selection Clause.[97]  Plaintiffs respond that "ordinary principles of contractual interpretation" bar the Non-Signatory Plaintiffs from coming "within the scope of the forum selection clause."[98]  For the reasons stated below, the court agrees with Plaintiffs.

In support of its argument to bind the Non-Signatory Plaintiffs, NetJets again directs the court to the Tenth Circuit's pronouncement in *Kelvion* that "a plaintiff cannot defeat a forum-selection clause by its choice of provisions to sue on, of legal theories to press, and of defendants to name in the suit."[99]  The court has already found this argument convincing with respect to Delta Pegasus, but NetJets reads too much into this holding by attempting to extend it to non-contract-signatories.  While it is true that the two parties in *Kelvion* did not themselves sign the

---

[94] *Compare* Dkt. 2 ¶¶ 36–41 (stating allegations in support of breach of contract claim), *with* Dkt. 37.

[95] *See Kelvion*, 918 F.3d at 1094.

[96] *See id.* (quotation simplified).

[97] Dkt. 42 at 7–10; Dkt. 50 at 2–7; 9.

[98] Dkt. 47 at 10.

[99] Dkt. 42 at 9 (quoting *Kelvion*, 918 F.3d at 1093); Dkt. 50 at 4 (same).

contract containing the forum selection clause, their direct "predecessors-in-interest . . . were the signatories to the contract,"[100] and the successor corporations took on their predecessors' contractual obligations in maintaining the business relationship.[101]  Here, by contrast, the Non-Signatory Plaintiffs never assented to the 2016 Agreement, and they allege injuries distinct from any contractual injuries felt by Delta Pegasus.  Thus, NetJets' attempt to extend the holding in *Kelvion* to the present situation is unavailing.

Next, NetJets argues that "a non-party is bound by a forum-selection clause if it is 'closely related to the dispute such that it becomes foreseeable that it will be bound.'"[102]  In so arguing, NetJets attempts to invoke an evolving jurisprudential doctrine known as the "closely-related-and-foreseeable test."[103]  There are at least two problems with this argument: first, the Tenth Circuit has neither adopted the closely-related-and-foreseeable test nor even addressed the non-signatory issue; and second, even if it had adopted the test, it is not clear that the Trusts are sufficiently related such that it would be foreseeable that they would be bound by the 2016 Agreement's Forum Selection Clause.  The court will address each of these problems, in turn.

Turning first to the state of the law on the closely-related-and-foreseeable test, the doctrine appears to be both ill-defined and inconsistently applied across jurisdictions.  Although NetJets contends "all the case authority holds that a non-signatory is bound by a contractual forum selection clause if it is 'closely related' to a signatory,"[104] this is simply not accurate.  The U.S. Courts of Appeals in the Second, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits have

---

[100] 918 F.3d at 1090 n.1.

[101] *Id.* at 1090–91.

[102] Dkt. 42 at 7 (quoting *Marano Enters. of Kan. v. Z-Teca Restaurants, L.P.*, 254 F.3d 753, 757 (8th Cir. 2001)).

[103] *See* John F. Coyle & Robin J. Effron, *Forum Selection Clauses, Non-Signatories, and Personal Jurisdiction*, 97 NOTRE DAME L. REV. 187, 198 (2021).

[104] *See* Dkt. 50 at 3.

all adopted some form of the doctrine, as have several state appellate courts.[105]  However, the First, Third, Fourth, Fifth and Tenth Circuit Courts of Appeal have not adopted the closely-related-and-foreseeable test[106] (though there are instances of district courts in those circuits applying some version of the test[107]).  Of note, the Third Circuit has expressly disavowed the "closely related parties doctrine" and recently adopted a rule that is logically incompatible with the doctrine by pronouncing that "a forum-selection clause can be enforced only by the signatory to the agreement."[108]  The Third Circuit's approach is thus consistent with the fundamental principle of contract law that only parties mutually assenting to an agreement can be bound by its terms, as discussed above.

NetJets directs the court to a few instances of district courts in the Tenth Circuit enforcing forum selection clauses against non-signatories.[109]  Yet, at the same time, other district courts in this Circuit have disavowed the ability to do so.  For instance, the U.S. District Court for the District of New Mexico has, on multiple occasions, explicitly rejected the closely-related-and-foreseeable test, holding instead that forum selection clauses do not bind non-signatories.[110]

In addition, a court in the District of Colorado recently cast doubt on the test—despite observing that "variations of the [closely related] doctrine appear to remain good law in at least

---

[105] Coyle & Effron, *supra* note 103, at 200–01; *see id.* at 201 n.43 (collecting cases).

[106] *Id.* at 201.

[107] *See id.* at 201 n.4 (collecting cases).

[108] *In re Howmedica Osteonics Corp.,* 867 F.3d 390, 407 (3d Cir. 2017) (quotation simplified); *see also Dayhoff, Inc. v. H.J.Heinz Co.*, 86 F.3d 1287, 1293-97 (3d Cir. 1996).

[109] Dkt. 42 at 7–8; Dkt. 50 at 5–7.

[110] *See, e.g.*, *Presbyterian Healthcare Servs. v. Goldman, Sachs & Co.*, 122 F. Supp. 3d 1157, 1211–12 (D.N.M. 2015) (declining to apply closely-related-and-foreseeable test based on a "concern[] about applying contracts and forum selection clauses to people who did not sign the contract"); *Presidential Hosp.*, 333 F. Supp. 3d at 1225–26 (noting the previous rejection of the closely-related-and-foreseeable test, considering whether to adopt the test, but concluding there was "no reason to depart from [the court's] previous determination that forum selection clauses do not bind non-signatories").

five circuits outside the Tenth Circuit" as of October 2020—by characterizing the doctrine as an

"amorphous" concept lacking a consistent definition or substantive basis, and "so vague as to be

unworkable."[111]  In reality, "'[c]losely related' appears to be an umbrella term that refers to a

variety of common law doctrines courts use to bind non-signatories to contracts, including third-

party beneficiaries, successors-in-interest, principals of signatory agents, and alter egos."[112]

Indeed, a survey of the cases cited by NetJets illustrates this point, as the cases do not establish a

coherent and consistent rule, and some do not even purport to be applying the closely-related-

and-foreseeable analysis.[113]  The limited scholarship on this issue includes similar observations

and critiques regarding whether the closely-related-and-foreseeable test is actually an

---

[111] *Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, No. 1:20-cv-02757-DDD-STV, 2020 U.S. Dist. LEXIS 191690, at *11–12 (D. Colo. Oct. 16, 2020) (quotation simplified).

[112] *Id.* at *13.

[113] *See* Dkt. 42 at 7–8; Dkt. 50 at 4–7.  In *Mozingo v. Trend Personnel Services*, the court applied a forum selection clause against two classes of non-signatory parties, concluding that the non-signatory plaintiffs were "'closely related' as a matter of law" because they were third-party beneficiaries of the contract.  No. 10-4149-JTM, 2011 U.S. Dist. LEXIS 95522, at *18–21 (D. Kan., Aug. 25, 2011), *aff'd on other grounds*, 504 F. App'x 753 (10th Cir. 2012).  The plaintiffs had named two defendants, a corporation and its president, and the court also concluded that the president was able to take advantage of the forum selection clause even though he had signed don behalf of the corporation rather than in his personal capacity because "it is difficult to imagine a party could be more closely related than Bobst as president of Trend Personnel Services, Inc., and Bobst in his individual capacity."  *Id.* at *21–24.  In *OKCDT Enterprise, LLC v. CR Crawford Construction, LLC*, there were two plaintiff LLCs, one of which signed an agreement containing a forum selection clause and the other did not.  No. CIV-18-1134-G, 2019 U.S. Dist. LEXIS 47607, at *7 (W.D. Okla. Mar. 22, 2019).  The court concluded that a non-signatory LLC was closely related both because it was the owner of the real property that was the subject of the dispute, and also the LLC's "sole member and manager" was the same person who had signed the agreement on behalf of the other plaintiff.  *Id.* at *8–9.  Both the *Mozingo* and *OKCDT* courts applied the Seventh Circuit's version of the closely-related-and-foreseeable test.  *See* 2011 U.S. Dist. LEXIS 95522, at *18; 2019 U.S. Dist. LEXIS 47607, at *8.  In another case cited by NetJets, *Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, the court altogether avoided endorsing any particular definition of the closely-related-and-foreseeable test, and instead applied "traditional, and less amorphous, contract doctrines" to reach the conclusion that the non-signatories were bound by the forum selection clause on several independent bases.  2020 U.S. Dist. LEXIS 191690, at *11–21.  Finally, NetJets cites *Christensen v. Norman*, in which a magistrate judge in the District of Utah did not apply any iteration of the closely-related-and-foreseeable test, but rather concluded that the plaintiff was subject to a forum selection clause in an agreement he did not sign because the plaintiff had brought the claims by asserting he was a third-party beneficiary of the contract. 2:17-CV-01283, 2019 WL 2147011, at *4, 8 (D. Utah, Feb. 4, 2019), *R&R adopted*, 2019 WL 1277520 (D. Utah, Mar. 20, 2019), *aff'd*, 791 F. App'x 755 (10th Cir. 2019).  In essence, the court held the plaintiff "cannot have it both ways" by alleging that "he is a third-party beneficiary of the [contract]" in order to bring the claim, yet "concurrently argue that although his agent . . . executed the [contract], he is not personally bound by [its] terms."  *Id.* at *8.  Thus, these cases taken together do not establish a cohesive and decipherable test that would be able to be applied in this case.

independent doctrine at all, or merely a modern amalgamation of traditional common law concepts that operate to bind non-signatories to contracts.[114]

Most importantly, "[t]he Tenth Circuit has never considered whether a forum selection clause can bind a non-party."[115] But in the related context of arbitration clauses, the Tenth Circuit has concluded that "mutual assent" to the underlying contract "is a prerequisite to the commencement of a valid arbitration agreement."[116] In support, it observed that holding otherwise would "turn [a] basic principle of contract law on its head."[117] Because the "Supreme Court has noted that there is substantial overlap between precedent interpreting the enforceability of arbitration agreements and forum selection clauses,"[118] these pronouncements by the Tenth Circuit militate against this court taking the opposite position and subjecting the Non-Signatory Plaintiffs to a forum selection clause to which they did not assent.

Thus, given the inconsistent application of the closely-related-and-foreseeable doctrine among the district courts in this Circuit and elsewhere, the doctrine's substantive clash with basic principles of contract law, and the lack of any direct pronouncements by the Tenth Circuit itself, this court is reluctant to wade into the fray and further muddy the waters in attempting to resolve the ongoing "debate over the merits of the 'closely related' doctrine."[119]

This conclusion is bolstered by the second overarching problem with NetJets' closely-related-and-foreseeable arguments: that is, even if the court were to apply some version of the

---

[114] *See* Coyle & Effron, *supra* note 103, at 200–05 (noting the replacement of traditional common law contract and agency doctrines with purported application of the closely related test in similar situations, as well as "doctrinal cousins" to the closely related test, which suffer from many of the same problems).

[115] *Presidential Hosp.*, 333 F. Supp. 3d at 1225.

[116] *Jacks*, 856 F.3d at 1304–05 (quotation simplified); *see also AT&T Techs.*, 475 U.S. at 648 ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [the party] has not agreed so to submit." (quotation simplified)).

[117] *Jacks*, 856 F.3d at 1305.

[118] *Presidential Hosp.*, 333 F. Supp. 3d at 1211 (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 518-19 (1974)).

[119] *Accord Fitness Together*, 2020 U.S. Dist. LEXIS 191690, at *13.

test, it is far from clear whether all three Non-Signatory Plaintiffs would thereby become subject to the Forum Selection Clause.  The doctrine, while sometimes incorporating a foreseeability inquiry, has been largely applied to bind nonparties to a contract in situations that echo traditional common law doctrines, such as agency, third-party beneficiaries, successor liability, alter egos, and estoppel.[120]  Accordingly, these traditional principles often act as corollaries through which courts apply the closely-related-and-foreseeable test.[121]  The court will utilize that approach here.

First, as to P.B., traditional agency doctrine might support the notion that she, as the disclosed agent, could bind Delta Pegasus, as principal, to agreements she signs on its behalf— but not the other way around.[122]  Yet the closely-related-and-foreseeable test has apparently been applied to operate in the opposite context, binding an agent to the contractual obligations of her principal simply "by virtue of her close relationship to the principal."[123]  Thus, under such an interpretation, it could be possible to conclude P.B was closely related to Delta Pegasus since she signed the 2016 Agreement as its agent, thereby binding her to the Forum Selection Clause.

But it is altogether unclear what doctrine, whether the closely-related-and-foreseeable test or any of its common law corollaries, would operate to enforce the Forum Selection Clause against the Trusts.  Whereas it is foreseeable—at least arguably—that an agent would be bound to the terms of a contract by physically signing it on behalf of her principal, it is wholly unforeseeable that a trust would be bound to an agreement entered into by a limited liability

---

[120] See id. at *12–13, 17–21 (collecting cases and applying several of the common law doctrines to bind non-signatory business entities to a forum selection clause); see also Coyle & Effron, supra note 103, at 194–204 (presenting an overview of traditional doctrines that operate to bind a non-signatory to an agreement and contrasting those doctrines with similar factual scenarios applied in closely-related-and-foreseeable jurisprudence).

[121] See, e.g., Fitness Together, 2020 U.S. Dist. LEXIS 191690, at *17–21.

[122] Coyle & Effron, supra note 103, at 204 ("Under the common law of agency, an agent is not a party to an agreement that she signs on behalf of a disclosed principal." (citing RESTATEMENT (THIRD) OF AGENCY § 6.01 (Am. L. Inst. 2006)).

[123] Id.; see also id. at 204 n.59 (collecting cases).

company with which the trust has no apparent formal relationship.  Indeed, NetJets makes no effort to explain how exactly it was foreseeable that the Trusts would later become bound by Delta Pegasus signing the 2016 Agreement, providing only the conclusory allegation that the Trusts "are closely related to each other, and to signatory Delta Pegasus."[124]  But NetJets provides no elaboration in its briefing how the Trusts are supposedly related to Delta Pegasus, nor was any given at oral argument.

The court is also unable to discern how any traditional common law principles would operate to bind a trust to a contract that one of its grantors signed not personally, but as an agent of an unrelated limited liability company.  According to the VAC and the parties' briefing, there is nothing in the record to suggest that the Trusts and Delta Pegasus possess any sort of agency relationship, that the Trusts are alter egos of Delta Pegasus, that they are successors-in-interest of Delta Pegasus, or that they are third-party beneficiaries of the 2016 Agreement.[125]  There is also nothing to support an estoppel theory, since there are no allegations that the Trusts themselves at some point acted to exploit or benefit from the 2016 Agreement.[126]  Thus, even if the court were to apply the closely-related-and-foreseeable test to this case, at most it would possibly subject P.B. and her claims to the Forum Selection Clause, but this would still leave the Trusts and their claims outside the Clause's reach.

---

[124] *See* Dkt. 42 at 8.

[125] Indeed, Plaintiffs point out that the 2016 Agreement includes a clause expressly stating "there are no third-party beneficiaries to any part of this Agreement."  Dkt. 47 at 7 (quoting 2016 Agreement ¶ D.3.13).  In Reply, NetJets resists application of the no-third-party-beneficiaries clause for several reasons, *see* Dkt. 50 at 3–7, but resolving this dispute is ultimately unnecessary because NetJets has not pointed to anything to establish that the Trusts are third-party beneficiaries of the Agreement in the first place, *see Fitness Together*, 2020 U.S. Dist. LEXIS 191690, at *17 ("[W]hile the contract[] language may bear on whether a non-signatory is a third-party beneficiary, establishing that the [non-signatories] are third-party beneficiaries is unnecessary here because that is just a particular subset of the kind of close relationship that satisfies th[e] requirement.").

[126] *See Fitness Together*, 2020 U.S. Dist. LEXIS 191690, at *17–18 (noting equitable estoppel "can prevent a party that has directly benefited from an agreement they are not technically a party to from avoiding forum-selection or arbitration clauses").

As the party attempting to invoke a transfer, it is ultimately NetJets' burden to establish that the Forum Selection Clause can be enforced against parties who did not sign the 2016 Agreement.[127]  For the foregoing reasons, the court concludes NetJets has not met that burden.

## IV. General § 1404(a) Considerations Weigh in Favor of Transferring all Parties and Claims to the Southern District of Ohio

Because NetJets has failed to meet its burden of demonstrating that "*all* parties have consented" to litigate in the Southern District of Ohio,[128] the court is left with a difficult decision.  Given the mandatory nature of the Forum Selection Clause as to Delta Pegasus, the court is functionally left with two options.  It could either: (A) sever the case and transfer only Delta Pegasus and its claims; or (B) exercise the broad discretion afforded under § 1404(a) to decide that, because Delta Pegasus and its claims must be transferred, traditional convenience, fairness, and justice considerations warrant transferring the rest of the case as well.  For the reasons stated below, the court concludes the latter option is best.

At bottom, venue transfer motions are governed by § 1404(a), which gives the court authority not only to transfer a case to "any district . . . to which all parties have consented," but also "to any other district or division where [the case] might have been brought," if doing so will best serve "the convenience of parties and witnesses" and is "in the interest of justice."[129]

Yet what should be done when both parts of § 1404(a) pull in different directions: where the defendants and one plaintiff have validly consented to be sued in another district through a valid forum selection clause, but all plaintiffs maintain that keeping the case in the present

---

[127] *Cf. Chrysler Credit*, 928 F.2d at 1515 ("The party moving to transfer a case pursuant to § 1404(a) bears the burden of establishing that the existing forum is inconvenient."); *Jacks*, 856 F.3d at 1305 ("As the parties seeking to compel arbitration, Defendants have the burden to establish that the nonsignatory plaintiffs can be held to the arbitration agreement.").

[128] *See* 28 U.S.C. § 1404(a) (emphasis added).

[129] *Id.*

district is most consistent with convenience and justice interests?  Plaintiffs contend that, in this situation, traditional § 1404(a) considerations trump the Forum Selection Clause and warrant keeping the entire case (including Delta Pegasus) in this district.[130]  For the reasons stated below, the court agrees that the traditional § 1404(a) considerations must be applied in this case, but finds those factors weigh against Plaintiffs' preferred course of action.

The Third Circuit faced a similar situation in *In re Howmedica Osteonics Corporation*,[131] which Plaintiffs referenced during oral argument.  Specifically, *Howmedica* addressed "how district courts should apply *Atlantic Marine* when all defendants seek a transfer to one district under § 1404(a), but only some of those defendants agreed to forum-selection clauses that designate a different district."[132]  As noted above, in the Third Circuit "a forum-selection clause can be enforced only by the signatory to the agreement,"[133] and thus the *Howmedica* court needed "to determine how forum-selection clauses affect the § 1404(a) transfer analysis where both contracting and non-contracting parties are found in the same case and where the non-contracting parties' private interests run headlong into the presumption of *Atlantic Marine*."[134]

The Third Circuit resolved this dilemma by adopting a "four-step inquiry" that begins with a court "presum[ing] that valid forum-selection clauses should be enforced against the relevant contracting parties," in lockstep with *Atlantic Marine*.[135]  In the second step, the court

---

[130] Dkt. 47 at 8–11.

[131] 867 F.3d 390.

[132] *Id.* at 399.  *Atlantic Marine* is the seminal Supreme Court case clarifying that, "in most cases, district courts must enforce valid forum-selection clauses when adjudicating § 1404(a) transfer motions."  *See id.* at 401.  *See generally Atl. Marine*, 571 U.S. 49.  But the Court in *Atlantic Marine* "did not have occasion to address how that general rule should apply where non-contracting parties are present," *see Howmedica*, 867 F.3d at 401, such as the situation here.

[133] *Howmedica*, 867 F.3d at 407 (quotation simplified).

[134] *Id.* at 402–03.

[135] *Id.* at 404, 406–07.

conducts "an independent analysis of private and public interests relevant to non-contracting parties" using the standard § 1404(a) factors.[136]  If the independent analysis suggests a different forum for the non-signatories than that mandated by the forum selection clause, then the third step involves a severance analysis under Federal Rule of Civil Procedure 21.[137]  "[I]n cases where severance is neither clearly warranted nor clearly disallowed," the court moves to the fourth step and applies discretion, balancing "efficiency interests in avoiding duplicative litigation" against "the non-contracting parties' private interests and any prejudice that a particular transfer decision would cause with respect to those interests."[138]  Thus, the fourth step involves an exercise of the court's "discretion to determine whether it should retain the case in its entirety, transfer the case in its entirety, or sever certain parties or claims in favor of another forum."[139]

On reviewing the authorities cited by the parties, as well as other relevant case law, and because the Tenth Circuit has not addressed what to do when a signatory attempts to enforce a forum selection clause against a non-signatory,[140] this court finds the Third Circuit's approach to be an appropriate framework to apply in this case for two main reasons.  First, the Third Circuit's four-step inquiry is grounded in generally applicable authorities, namely *Atlantic Marine*, § 1404(a), and Rule 21.[141]  And second, the Third Circuit approach is substantively consistent with how the District of New Mexico has addressed this issue.[142]

---

[136] *Id.* at 404, 408.

[137] *Id.* at 404, 408–09.

[138] *Id.* at 405.  In short, the four-step inquiry "consider[s] in sequence: (1) the forum-selection clause[], (2) the private and public interests relevant to non-contracting parties, (3) threshold issues related to severance, and (4) which transfer decision most promotes efficiency while minimizing prejudice to non-contracting parties' private interests."  *Id.* at 403–04.

[139] *Id.* at 405.

[140] *See Presidential Hosp.*, 333 F. Supp. 3d at 1225.

[141] *See Howmedica*, 867 F.3d at 403–05.

[142] *See, e.g.*, *Presbyterian Healthcare*, 122 F. Supp. 3d at 1212–14 (declining to apply a forum selection clause to a non-signatory using the closely related test based on concerns about binding parties to a contract they did not sign,

As to the first step, the court has already concluded that the Forum Selection Clause is mandatory and enforceable with respect to the contracting party, Delta Pegasus.[143] Turning to the second step, the court will proceed with an "independent" § 1404(a) analysis concerning the Non-Signatory Plaintiffs, considering the public and private interests at stake. In the Tenth Circuit, the following non-exclusive list of factors applies to a § 1404(a) analysis:

> [1] the plaintiff's choice of forum; [2] the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; [3] the cost of making the necessary proof; [4] questions as to the enforceability of a judgment if one is obtained; [5] relative advantages and obstacles to a fair trial; [6] difficulties that may arise from congested dockets; [7] the possibility of the existence of questions arising in the area of conflict of laws; [8] the advantage of having a local court determine questions of local law; and, [9] all other considerations of a practical nature that make a trial easy, expeditious and economical.[144]

According to Plaintiffs, "all of these factors weigh in favor" of keeping the case in the District of Utah.[145] For the following reasons, the court disagrees.

As to the first factor, the Non-Signatory Plaintiffs chose this forum, which weighs against transfer. As to the second and third factors, Plaintiffs assert that proving their claims "will require the attendance and testimony of a variety of Utah-based fact witnesses and an expert medical provider who is also located in Utah," and that "[t]o compel Plaintiff[s] to either rely upon deposition testimony at trial, or to attempt to obtain personal appearance of the witnesses in Ohio, is both unreasonable and unduly expensive."[146] To demonstrate witness inconvenience,

---

finding that transfer of those parties was nonetheless "appropriate based on traditional § 1404(a) concerns regarding convenience and justice," considering whether to sever, but ultimately ordering transfer of the entire case because severance would result in "two separate actions in two different courts based on the same set of facts" ); *Presidential Hosp.*, 333 F. Supp. 3d at 1226, 1235–36 (when facing a forum selection clause signed by only some of the parties, applying a § 1404(a) analysis as modified by *Atlantic Marine* and concluding that severance of the signatory parties and their claims was appropriate).

[143] *See supra* Section III.B.

[144] *Chrysler Credit*, 928 F.2d at 1516 (quotation simplified).

[145] Dkt. 47 at 9–10 (quotation simplified).

[146] *Id.* at 10–11.

Plaintiffs "must (1) identify the witnesses and their locations; (2) indicate the quality or materiality of their testimony; and (3) show that any such witnesses were unwilling to come to trial, that deposition testimony would be unsatisfactory, or that the use of compulsory process would be necessary."[147]  Although Plaintiffs assert generally that their witnesses are located in Utah, Plaintiffs have not "identif[ied] the witnesses," addressed the "quality or materiality of their testimony," or addressed any of options for the third element.[148]  Thus, because Plaintiffs have not fully engaged with the required showing to demonstrate witness unavailability, the second and third factors weigh only slightly against transfer.

Plaintiffs do not address the fourth through seventh factors, but do address the eighth factor, "the advantage of having a local court determine questions of local law."[149]  Plaintiffs convincingly point out that, since the Non-Signatory Plaintiffs assert Utah state law claims in the VAC, resolution of these claims would benefit from being heard in a local Utah forum.[150]  The court agrees, and finds this factor weighs in favor of maintaining the Non-Signatory Plaintiffs' claims in the present forum.  Plaintiffs do not engage with the ninth factor, but the court observes any trial would be made more "easy, expeditious and economical"[151] by keeping all parties and claims together in one case.  Thus, the ninth factor weighs in favor of transferring the entire case.

After considering all the § 1404(a) factors under the second step, the balance does not clearly weigh one way or the other with respect to the Non-Signatory Plaintiffs.  But assuming for the sake of argument that the present forum is more convenient for the Non-Signatory Plaintiffs' claims, the court moves next to the third step: severance analysis.  Even when "no

---

[147] *Id.* (quotation simplified).

[148] *See id.*

[149] Dkt. 47 at 11 (citing *Chrysler Credit*, 928 F.2d at 1516).

[150] *Id.*

[151] *See Chrysler Credit*, 928 F.2d at 1516.

party has requested that the [c]ourt sever and transfer parts of this case, a district court may sever a case under Rule 21 to 'transfer one action while retaining jurisdiction over the other.'"[152]  On these facts, it is not apparent that severance is either "clearly warranted to preserve federal diversity jurisdiction" or "to cure personal jurisdiction, venue, or joinder defects."[153]  At oral argument, counsel for Plaintiffs seemed to suggest that it severance would be clearly disallowed because Delta Pegasus is an indispensable party to the suit.[154]  But this argument was not addressed in Plaintiffs' briefing (other than a cursory assertion in the VAC that "Delta Pegasus makes no claims for affirmative relief herein but is a necessary party hereto pursuant to Fed. R. Civ. P. 19(a)"[155]), and it was not fully explained at oral argument why Delta Pegasus is indispensable under Rule 19.  In any event, the court finds severance is "neither clearly warranted nor clearly disallowed" on these facts.[156]

Moving to the fourth step, severance would almost certainly result in concurrent actions litigating essentially the same issues, meaning it would not serve "efficiency interests in avoiding duplicative litigation."[157]  On the other hand, there is a legitimate concern that the Non-Signatory Plaintiffs' private interests may be prejudiced to some extent if transferred to a forum not accustomed to routinely applying Utah law.[158]  The court acknowledges Plaintiffs' preference for resolving their state law claims in a local forum.[159]  But this preference ultimately carries

---

[152] *Presbyterian Healthcare*, 122 F. Supp. 3d at 1214 (quoting *Chrysler Credit*, 928 F.2d at 1519); *see* Fed. R. Civ. P. 21 (providing that, "[o]n motion or on its own," a district court "may . . . sever any claim against a party").

[153] *See Howmedica*, 867 F.3d at 404.

[154] *See id.* at 404–05 (describing how, in some cases, under the third step severance will be "clearly disallowed, such as when a party is indispensable under Federal Rule of Civil Procedure 19(b)").

[155] Dkt. 37 ¶ 2.

[156] *See Howmedica*, 867 F.3d at 405.

[157] *See id.*

[158] *See id.*

[159] *See Chrysler Credit*, 928 F.2d at 1516 (recognizing this as an advantage for plaintiffs bringing state law claims).

minimal weight because federal courts are frequently tasked with applying law of states in which they do not have coextensive jurisdiction, and are able to handle such claims competently.[160]

The court is unconvinced that the prejudice to Plaintiffs from another forum considering their claims outweigh the significant countervailing efficiency and justice concerns of keeping the entire case together.  Courts are generally obliged to be "mindful of judicial efficiency concerns . . . and might not sever and transfer a case when doing so results in two venues hearing virtually the same case based on the same set of facts."[161]  That is precisely the situation presented here.  All Plaintiffs assert both the restitution and exploitation of a vulnerable adult claims; thus there is no discernable distinction between the claims as asserted by Delta Pegasus and the Non-Signatory Plaintiffs.  In addition, according to the VAC there is no distinction between the injuries experienced by Delta Pegasus and those experienced by the Non-Signatory Plaintiffs.  The injuries alleged are the amounts that were allegedly wrongfully paid by P.B. and the Trusts to fulfill Delta Pegasus's contractual obligations.[162]  Consequently, if the court were to sever the case and transfer only Delta Pegasus and its claims, there would undeniably be duplicative litigation in two districts, considering the same operative facts and injuries.  As another district court in this Circuit facing the same issue aptly concluded, "[t]he [c]ourt agrees with the principle that it should not sever . . . when the cost to judicial efficiency outweighs the benefit to the parties, particularly in light of § 1404(a)'s purpose to minimize inefficiency."[163]

---

[160] *See, e.g.*, *Doe v. Uber Techs., Inc.*, No. 17-cv-00950-WHO, 2017 U.S. Dist. LEXIS 83462, at *18 (N.D. Cal. 2017) ("Federal courts routinely apply the laws of other states, and other federal courts are fully capable of applying California law." (quotation simplified)); *Midwest Motor Supply Co. v. Kimball*, 761 F. Supp. 1316, 1319 (S.D. Ohio 1991) ("The present case . . . does not appear to present any novel or complex issues under Ohio law. Thus, although this Court is more familiar with Ohio law than the Northern District of Georgia, it does not appear that Ohio contract law is so unique that this fact alone should strongly militate against transfer.").

[161] *Presbyterian Healthcare*, 122 F. Supp. 3d at 1214.

[162] Dkt. 37 ¶¶ 28, 31.

[163] *Presbyterian Healthcare*, 122 F. Supp. 3d at 1214 (citing *Cont'l Grain Co. v. FBL-585*, 364 U.S. 19, 26 (1960).

Finally, when considering a venue transfer motion, courts are not only supposed to consider all the factors relating to convenience, but also matters of "fairness."[164]  The court observes that severing the case would be unfair not only to NetJets, but also to Plaintiffs.  Having two duplicative actions proceeding concurrently could lead to inconsistent results, potential issue preclusion, or even judgements that are later rendered unenforceable.[165]  At a minimum, it would impose significant additional expense.  None of these outcomes would be fair to Plaintiffs.

After considering the mandatory nature of the Forum Selection Clause as to Delta Pegasus, the Non-Signatory Plaintiffs' private convenience interests under the relevant Tenth Circuit factors, the possibility of severance under Rule 21, and the direction from § 1404(a) and federal common law to prioritize justice, efficiency, and fairness interests, the court is compelled to transfer the entire case.

## V.  *Resolution of NetJets' Motion to Dismiss is Left for the Transferee Court*

Once determining that a case must be transferred to another venue, "the transferor court loses all jurisdiction over the case," including over other pending motions.[166]  "When an action is transferred, it remains what it was; all further proceedings in it are merely referred to another tribunal, leaving untouched whatever has been already done."[167]  Accordingly, NetJets' Motion to Dismiss remains pending, and must be left for the transferee court to resolve.

---

[164] *Stewart*, 587 U.S. at 29; *accord Chrysler Credit*, 928 F.2d at 1516.

[165] *Cf. e.g.*, *Chrysler Credit*, 928 F.2d at 1513–14, 1518–20 (considering situation where Western District of Oklahoma decided to sever case, some claims were transferred to Eastern District of Michigan, transferee court opted not to enforce judgment by Western District of Oklahoma, and the Tenth Circuit then concluded that the Sixth Circuit had discretion to decline to enforce the judgement of the transferor court under the law of the case doctrine where "clearly warranted").

[166] *Id.* at 1516–17.

[167] *Id.* at 1516 (quotation simplified).

**CONCLUSION**

For the foregoing reasons, NetJets' Renewed Motion to Transfer Venue[168] is GRANTED

and the case is hereby TRANSFERRED to the United States District Court for the Southern

District of Ohio. This court therefore lacks jurisdiction to consider NetJets' Motion to

Dismiss.[169] That Motion remains pending for resolution by the transferee court.

SO ORDERED this 28th day of September, 2022.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[168] Dkt. 42.

[169] Dkt. 41.